Good morning, everyone. I want to just take a second to thank the Honorable LaGrom Davis, a very distinguished district court colleague, for sitting with us today, and we're indebted to you, and thank you. Hopefully, we can get you back here more often. After this, we may never see you again, but with the complexities of this case, hopefully, we can get you back here again. My pleasure. The first case is Mejia v. Atty. Gen and also Valdebezio-Galdamez v. Atty. Gen, and I assume, Ms. Duffy, you're going to argue first for Valdebezio-Galdamez? That is correct, Your Honor. Okay. Did I say Ms. Duffy? I'm sorry. I'm sorry? Did I say Ms. Duffy? I think I may have. I said Mr., Your Honor. Sorry, two women, and okay. Thanks. Mr. Duffy, I'm sorry. Thank you, Your Honor. Petitioners collectively reserve two minutes of rebuttal. Okay. May it please the Court. As I indicated, Your Honors, my name is Martin Duffy, and along with Ayo Gonzalo, we're pleased to represent Mr. Mauricio Valdebezio-Galdamez in this matter before the Court. Also here, consolidated for purposes of oral argument, is Ms. Jessica Riccobar, who is representing another petitioner on, obviously, a related issue. Now, how do you, are you, since the facts are so, the law is exactly the same, the facts vary only slightly, so that we don't start asking you questions, and then you tell us, well, my colleague's going to answer those. How are you going to split this? Are you going to only respond to the law as it applies to the facts of your case, because that, the fact, the law's the same? Yes, Your Honor. I believe the law's going to be the same, and I think the facts are very similar in this regard. I will tell you, just for the Court's benefit, what I plan to do is address the new standard that's been imposed by the BIA, and also address Mr. Galdamez's request for asylum under political opinion. I rely on our briefs for the remainder of our arguments. I believe Ms. Riccobar is going to address the specific issues of asylum as the facts tie into her particular case. Okay. You speak very softly, as do I. Maybe you can keep your voice up a little bit. Will do. Thank you, Your Honor. You mentioned political opinion. I wasn't sure that was before us, but you're now abhorrent to the gangs that are trying to recruit him. Is political opinion under Section 208 and should have been regarded as such? Yes, Your Honor, and it was briefed in this case, and the reason why political opinion should be regarded or his opposition to the criminal ideology of this gang and refusal to participate in... Do they have the criminal ideology?  Do they have an ideology at all, the gang? Well, ideology in the broadest sense, Your Honor, but the country reports that are replete within the record indicate this is a very violent gang. The record shows that this gang engages in things such as kidnapping and murder and rape, decapitation, very hard activities. Our client specifically refused to join the gang because he did not want to do that. He did not want to engage in that kind of activity. He was morally opposed to doing that, and in fact, one IJ, IJ Immigration Judge Castro, said that the refusal to participate in criminal activity and the opposition to a criminal lifestyle is the quintessential expression of political opinion. The government in its brief has argued that this case is simply foreclosed by the Supreme Court's case in Elia Zacharias, but as we indicate, it's not For multiple reasons, two primary reasons. First, the Supreme Court did not specifically address whether Mr. Elia Zacharias had or was expressing a political opinion. It commented and dictated to say, really, all Mr. Zacharias was doing was saying he didn't want to choose sides. Quite to the contrary, in our case, the facts are not disputed. Mr. Galdamez's testimony is that he refused to participate because he did not want to engage in that criminal activity, and that was testimony that the IJ considered to be credible. So the Supreme Court case in Zacharias did not even reach the decision as to whether Mr. Zacharias was expressing a political opinion because it said secondarily, we find that Mr. Zacharias has not proven that he will suffer or has suffered persecution on account of a protected ground. Regardless of whether it is political opinion or not, he has not shown that the activities of the gang members were directed at him in opposition to his political opinion or the expression of his political opinion, but rather simply as a matter of wanting to increase their own ranks. Again, the facts of this case are different than that. Mr. Galdamez was threatened on multiple occasions by this gang, and on the last occasion where they kidnapped him, dragged him up the mountain, tied him to a tree, and beat him for 45 hours, at that point they said, we are no longer going to have you join our gang. We're going to kill you because of your refusal to join our gang. So when we look at the differences between Elia Zacharias and our case, they're completely and fundamentally distinguishable, and the government's sole response to our political opinion argument is that it's foreclosed by Elia Zacharias. The cases are completely distinguishable. If you're right about that, then how do you limit it? How does that write? Because obviously one of the concerns the government has here, and frankly I'm trying to make sense out of this social visibility and particularity element, and I'm beginning to think it is what in any given case someone says it is. I can't reconcile the cases on that, but at least there's an effort there on the part of the government, it seems to me, to contain that which would otherwise be not subject to being contained. I'll get into this with Mr. Hurt. I think Acosta goes about as far to contain it as you can. But how do you contain political opinion? Because then anyone who Well, if it is political opinion, and that's a judgment that this court has to make. But again, the opinion expressed or the opposition expressed in Elia Zacharias was simply, the petitioner in that case said, look, I choose not to choose sides. He was approached and recruited by a gang element, and he said, I don't want to choose your side versus, it was an anti-government gang, versus the government side. I choose not to choose. Quite different. That's not the expression of a political opinion. That's just, as the Supreme Court in that case said, no more different than simple risk aversion. In this particular case, the stated record testimony of our client, which has been deemed to be credible by the immigration judge, was an expression of the political opinion that he chose not to participate in that criminal ideology. Whether to your point, Judge McKee, that is political opinion. I point to Judge Castro's opinion that the opposition to crime, how to treat it, how to punish it, how to deal with it, to be opposed to it or to engage in it, is the penultimate expression of, or the ultimate expression of political opinion. It's what every society engages in. Let me, if I can, the age thing is kind of, one of the main things that has befuddled me. Your client was somebody 26? He's 26 now? That's correct, Your Honor. He's 25 right now. If you define the group in terms of the ages, and I think it was defined at some point, young men between the ages of 14 and 25 were part of this gang, wouldn't that have become moot if your client is going to be older than the age of the cohort that he says that he doesn't want to join? It's a very good question, Your Honor, and the answer is no, it would not, because he has already been identified by this group. He was within that particular social group at the time. He was persecuted and suffered past persecution on account of his association with that group. And if he's returned... They're going to persecute him or kill him because 15 years ago he didn't join their gang? Certainly, if he's returned now, Your Honor, we believe that he would. But that wasn't my question. If he's returned when he's 40, Your Honor, I don't have an answer to that particular question. But clearly, to the extent that gang members will hold that against him as they are holding it against him now, I can't speak to what that gang will do in 15 years or who will be membership of that gang, but that gang is clearly a cross-national and certainly cross-Honduran gang because Mr. Galdemez was persecuted on multiple different occasions by multiple different members of the same gang. So there's clearly a communication network going on within this gang that would allow them to know and find out that he's back in the country and to seek retribution on him. How do you define the particular social group? It has been defined, Your Honor, by the Board of Immigration Appeals in its Acosta decision back in 1985, and that opinion was adopted by this Court in Fatim in 1993, and it's that which has an immutable characteristic, immutable characteristic not capable of being changed or so innate to the person's conscience that it should not be changed. All right, that's the legal definition, but how are you defining to what particular social group does your client subscribe or belong? It is young, Judge Hardiman, it's young Honduran males who have been recruited by gangs when they refuse to join the gang. But there's co-counsel sitting there telling us that that's not right. It's young El Salvadoran men as well. It could be two separate, it could be different political or different particular social groups in different countries. It depends upon the country of origin and the cultural experience that they come from. So Salvadorans who rebuff the Mara Salvatrucha constitute one particular social group, Hondurans who rebuff them are a different particular social group, Guatemalans and Mexicans who rebuff them are two additional particular social groups? Certainly, Your Honor, it certainly can be that way. And undocumented Salvadorans living in L.A. who rebuff them in L.A. constitute a separate particular social group? I wouldn't know about L.A., Your Honor, it would depend upon the other countries. But a gang is very potent in L.A., it's very potent in Washington, D.C., many major cities in the U.S. Yes, Your Honor, but in order to qualify for refugee status, you not only have to show membership in a particular social group, but also that you suffer persecution that a government is unable or unwilling to prevent. And as I said to your example in L.A., I don't know if it would be the same that the U.S. government be unwilling or unable to prevent that. We certainly have evidence in this case that the Honduran government is unable or unwilling to prevent this persecution on our client, and I believe the same facts exist in El Salvador. If I could point you, Your Honor... But are these all, what I'm getting at is, are these all different particular social groups or are they all the same particular... They would be different particular social groups. And that's, you lead me to one of the most important points in this case, Your Honor, the change the BIA has brought about with these recent decisions, adding these new requirements that were not previously there. If those requirements were imposed, many of the groups that had been previously recognized, not only by this court, but by the BIA, would lose that protected status. For example, this court in the Gomez decision back in 2008 found as a particular social group women who have escaped involuntary servitude after being abducted and confined by Colombian rebels. There's no way you would know from a social visibility analysis that those women would be distinguishable from other members of the group. However, this court has also recognized children who have escaped military conscription. I was going to ask you about that because in that case, Lukawaga, what would seem to be different, and difference may dissipate based on how you define the group, because they always faced a realistic fear of persecution because they had been child soldiers in that country. As I initially understood your group, you weren't arguing that there'd be a fear of persecution for having resisted recruitment into the gang, but the persecution was for resisting recruitment into the gang. If he's at an age now where he would no longer be subject to recruitment, it seemed like again, upon return, there wouldn't be a good faith or realistic, well-founded fear of future persecution. Are you saying I'm wrong because of the way I'm looking at your definition? Yes, Your Honor, I believe so. First of all, with respect to the legal standard, it's already been, I believe, established by this court that our client did suffer persecution in the past, and as this court pointed out- Because in the past, he was within the cohort where he could be recruited. Exactly, and as this court pointed out in a previous decision, as the law applies, once we have proven past persecution, the burden shifts to the government to prove that there will not be future persecution. There's been no such evidence in that particular case. Well, why didn't they meet that simply by saying that he's no longer in the group where he would be subject to the persecution? That would be enough to undermine the presumption, wouldn't it? That would assume, Your Honor, that this group will no longer persecute him simply because he's fallen out of a specified age frame, but the evidence is this group will persecute him, and they've already threatened to do so because of his refusal. His past experience was a refusal to join this gang, and because of that, that was the genesis for the threat against him to his life. There's no reason to believe that those threats won't continue in the future, and again, the burden shifts to the government to do that. The main point about the change in this standard, Your Honors, is that it will vitiate many groups that have already been recognized by this court as entitled to protection under the laws, both domestic and international laws for refugee protection. An agency- The board does, in fact, have the authority to look at circumstances as they develop and to refine the standard, do they not? Absolutely, Judge Davis. And obviously, given Chevron, there's a particular standard of review for the board's adjustments to the standard, is that correct? That is correct. Now, you suggest that this refinement is arbitrary and capricious and not entitled to the deference under the law. I need you to tell me specifically why it is arbitrary and capricious. You're correct, Your Honor, and that was the United States Supreme Court case, which indicated that a board is entitled and is entitled to deference in making decisions of interpretations of statutory provisions. But the United States Supreme Court in the State Farm decision back in 1983 indicated that if an agency is going to change its interpretation, it has to give a reasoned analysis for that. And there is, in fact, a presumption against the change. Why is this change not permissible under the United States Supreme Court standard? Because it's inconsistent, Your Honor, with past board decisions. As I said, it would take many groups that had been previously accorded protection as refugees, both domestically and internationally, and no longer give those groups the same protection that this court previously said they were entitled to. So it's inconsistent with prior board decisions. That might help you on social visibility, but it doesn't help you on particularity. What's interesting, Your Honor... In SEG, SEG was decided just in 2008, and the holding, correct me if I'm wrong, is that Salvadoran youths who have resisted gang recruitment do not constitute a particular social group. There's no change there. Can you answer Judge Davis's question, focusing not on social visibility but on particularity? Why is that SEG decision not entitled to Chevron deference? It's one of the problems with the BIA's change to the standard, fundamental change to the standard. What do they mean by particularity? The SEG case, Judge Hardiman defined particularity as follows. The essence of the particularity requirement is whether the proposed group can accurately be described in a manner sufficiently distinct that the group will be recognized by the society in question as a discrete class of persons. The board itself doesn't understand what particularity means. It has defined it the same way it has defined social visibility. And if we apply social visibility to groups that have been previously recognized by this court, such as the escaped child soldiers in the Lucrego's case, and the women who have escaped voluntary inservitude in the Gomez-Zalaga case, and numerous other cases cited in our individuals who this court said are entitled to protection as refugees, if we allow the BIA to change its standard now, we will say that those same groups are no longer, or future applicants who request the protection of our asylum laws, will no longer be entitled to the same protection that this court accorded the same, not similarly situated, but the same situated individuals in the past. That's what makes this decision arbitrary and capricious, Judge Davis. That's what makes this decision not entitled to deference under Chevron and under State Farm. And I would add further that in SEG and EAG, Judge Hardiman, the board got it wrong. Part of its reliance on this decision was on international law, and they cited the guidelines put out by the United Nations High Commissioner for Refugees. The guidelines put out by the High Commissioner gave an alternative standard for the definition of particular social group. Either those with immutable characteristics, or if they don't have immutable characteristics, then those who have a certain social perceptibility. In relying upon those guidelines, those international standards, the board got it wrong. International guidelines don't require that, and what's more, the change to this definition goes contrary to congressional intent, which is yet another reason why this court is entitled to strike down this definition. In passing the 1980 refugee law, Congress intended to bring U.S. refugee law in conformance with international law. That principle was specifically laid out by this court in the Fatim decision in 1993. Well, international law is governed by the guidelines put out by the UNHCR, which says that a particular social group can either be those with immutable characteristics, or those who are perceived as a group by society. By imposing a societal visibility, and as I indicated, particularity seems to be the same in the board's confused definition. By adding a social visibility requirement to refugee status under U.S. law, the board in one stroke will not only take away refugee protection to those previously entitled to it, but will also take U.S. refugee law out of a consistent pattern with the United Nations law, which is specifically what Congress intended. And one last thing, your honors. In ruling on the board decision in SEG, it relied in part upon a misunderstanding of international law. It also relied in part upon the Gomez decision in the Second Circuit. Now, what's interesting about the Gomez decision... We'll do the other one first. What was the misunderstanding on international law other than Section 202 of the guidelines? My apologies, your honor. What I just indicated, that what the SEG case in relying upon the international guidelines was that the international guidelines impose a requirement for social visibility when they do not. They clearly do not. And in relying upon the Gomez case, the Second Circuit decision, what's interesting about that case is this. When ACOSTA came down, and ACOSTA has been the defining standard for recognizing particular social goods for nearly 25 years, many circuits, including this circuit, the First Circuit, the Seventh Circuit, have adopted the ACOSTA standard and followed it very clearly. There was one circuit that had a slight variation upon that. That was the Gomez decision, the Second Circuit, back in the mid-'90s. And what Gomez said, it applied a bit of a social visibility requirement to the definition of a particular social group in the Second Circuit. And what Gomez says very clearly is, we're looking for a level of social visibility such that the person who is persecuted would be visible to his or her attackers or to society in general. That's a significant difference than making social visibility a requirement to society in general. There are many people. When you look at the examples of the cases that we have so far, the abducted children soldiers that this court recognized in Luaguago. I'm troubled by that because if it's enough that you're visible to your attackers, then you could be a particular social group of one. What if this gang wants to recruit someone because he knows nuclear fission? And they persecute him. They want him to be on their team and help develop weaponry for the gang. They know him. He's visible to them. You're saying that because, even though society wouldn't recognize this nuclear physicist as a particular group, he's just an individual, you're saying that because the gang, he's visible to the gang and they really want him, that that man would constitute a group? No. He would not. He would not, Your Honor. So it has to be society at large, then. It can't just be someone who's visible to the gang. No, because, Your Honor, the particular social group under ACOSTA has already been defined. You're arguing just ACOSTA and nothing beyond ACOSTA. Exactly. The problem is adding to ACOSTA. More precisely, Judge McKee, changing ACOSTA. What ACOSTA defines particular social group as, a group of persons sharing common characteristics. Those common characteristics must either be innate to the individual. They can be such things as race, kinship, or they can be shared experience, landowners, former military officers. Or they can be things that a person should not have to change because they're individual to their identity, but it must be shared characteristics of a group. And I believe defined by this court, if not this court, then the U.S. Supreme Court, as anyone more than one person. But the troubling aspect you have with that is the same troubling aspect that we're having with the Judge Hardiman, which is imposing a social visibility requirement, which is inconsistent with prior law. Well, I'm willing to concede for a minute that you're right on social visibility, but I'm still wondering where the particularity is. And I guess your answer to my previous question and following up on Judge Davis's question is that you're eliding social visibility and particularity into one definition, or did I misunderstand you on that? If you are, it's my fault, Your Honor. My apologies. I'm not trying to meld them together. I think you're saying you need both. The board has no idea what the difference is. Don't you need both? You need particularity. And you're arguing, and I think with some real persuasive force, that the social visibility issue is problematic. But don't you still need to persuade us that your client falls within a particular social group, and that's a particular social group that SEG, at least with respect to Salvadorans, has said unequivocally the Board of Immigration Appeals has said this is not a particular social group. Yes. Yes, Your Honor. But particularity, to the extent that we're talking about some definition of the group, has always been part of the definition. And I would add that this Court, in its prior decision, which is another misstatement of one of the recent cases I saw that came out, in its prior decision, while this Court did not specifically rule on whether Mr. Galdamez's proposed particular social group was, in fact, a particular social group, and this Court did not do that out of deference to the law, to the United States Supreme Court's law in Thomas v. Gonzalez, I believe, which says that this Court should not, in the Court of Appeals in general, should not in the first instance decide whether or not a group is a particular social group. This Court sent the decision back, vacated the immigration judge's entire decision and sent it back for proceedings consistent with the opinion for multiple hours. One of those hours was the immigration judge and, therefore, the Board of Immigration Appeals, the fact that they didn't even decide that Mr. Galdamez's claim of a particular social group. This Court correctly sent it back, but what's of interest, significant interest, is this Court respected the presidential authority of the United States in sending it back and not ruling on it in the first instance. But it said in dicta, this certainly sounds like a particular social group to us. What would be the remedy? Would the remedy be to send it back yet again and say, look at this and determine whether or not it's a particular social group without adding the requirement of particularity and social visibility? I believe this Court can do one of two things at this juncture. Consistent with the Thomas v. Gonzalez opinion, which prohibits this Court from deciding the issue in the first instance, this Court has already given the Board of Immigration Appeals its try, and it's gotten it wrong. We don't know if the Board would say, well, I think we do know, but in theory we don't know. Were it not the Board, if they didn't impose social visibility and particularity, would look at this and say, all right, this is a particular social group. Let's assume it's another legal fiction, we engage in it all the time. Let's assume that we don't know what the Board would do if this case were to go back without those two requirements. Why shouldn't we, pursuant to that legal fiction, and procedurally I think that's the way we would normally proceed, send it back and say you were wrong on social visibility and particularity. Look at this allegation and determine a particular social group without adding anything to it. I believe that is one of the things this Court is certainly entitled to do. Essentially what, Judge McKee, you're saying is do what we told you to do, do what this Court told you to do before. This Court can rule that social visibility and particularity should not be considered, for all the reasons we discussed today, should not be considered part of the standard. Strike that, send the case back, and have a ruling on whether Mr. Galdamez constitutes a particular social group under the standard as existed under Acosta and adopted by Fatim. But I also believe that this Court wishes it can make the decision itself, because the Thomas v. Gonzalez decision says you can't do it in the first instance, and you've given the Board the opportunity. And I will add that this would not be the first time the Seventh Circuit in the Gattini decision, as well as the Ramos v. Eric Holder decision, have specifically found that these two newly added requirements change the existing law and shouldn't be part of it. In Gattini, the Seventh Circuit, this was an August of 2009 decision, said that these new things, social visibility and particularity, as defined by SEG, make no sense. It says if you are a member of a group that has been targeted for persecution, you will take pains to avoid being socially visible. The Seventh Circuit also ruled because it was inconsistent with Seventh Circuit prior law, just as SEG is inconsistent with prior Third Circuit law, just as it is inconsistent with Fatim. And that's what the Seventh Circuit did. It said we rule both of these standards to be contrary to the intent, and we're not going to follow them. It said the particularity standard is contrary? No, no, Your Honor. Hardiman said the social visibility standard was. No, that wasn't me. I wasn't sitting on the Seventh. You meant Posner. You said Hardiman. Posner. Don't insult Judge Posner. My apologies. No, Judge Posner, he took the social visit. Much of your social visibility argument echoes what he was criticizing in Gattini. But in Gattini, he specifically wrote, we have no quarrel with the rejection in those cases of the attempted classification of specific groups as particular social groups. And then he cites the first string cite of many is the Ninth Circuit's decision in Ramos-Lopez, which held young Honduran men who resist being recruited into gangs. He's saying they are not a particular social group. And I can't find a single court of appeals decision in the country, and I don't think anybody cited one, where a court of appeals has held that either Salvadoran men or Honduran men or any other men who rebuff efforts by the MS to recruit them constitute a particular social group. And I can't point you to one either, Judge Hardiman. I will say that the Ninth Circuit is the only circuit which I can think of that has endorsed or has ruled that such a characterization does not constitute a particular social group. But those decisions didn't come out until after SEG and EAG. And I believe in that decision, the Santos-Lumos decision, the court specifically noted that it had not previously considered whether this group constituted a particular social group, and therefore it was operating, so to speak, on a blank slate. So fundamentally, you're asking us to weigh in on the opposite side of an emergent circuit split regarding the validity of SEG. Yes, I am. That's the ultimate issue here. Yes, I am, Your Honor. And this circuit would not be standing alone by doing so. And the Seventh Circuit has already done so. And I would add that for the same reasons the Seventh Circuit did so, it did so in part, part because it said it didn't make sense, but part because it said it was contrary to its prior precedent. And as I said, this new standard is contrary to prior Third Circuit precedent, as it would take groups that were previously recognized and derecognize them, if that's possible. And the important… Win the battle and lose the war. I mean, it's certainly possible that we would find that you're right on these two new elements. It would go back. And then, looking at it across, the client would still not be able to prevail. Judge, anything is certainly possible. I've learned that in my experience with this BIA. But I would indicate to this court that this court previously ruled in… Rules, not the word, previously stated in dicta that this certainly sounds like, this certainly sounds like a particular social group. Judge Rendell wrote the opinion. This sounds like many of the, has many of the same characteristics as the BIA has already recognized to be particular social groups. And we have to remember the essence… Is that it? Maybe it is. That's the only way maybe to make sense out of the precedent. It's a duck test. If it sounds like, looks like, quacks like, walks like, then it is. The opinion read, the group in which Galvin has claimed membership shares the characteristics of other groups that the BIA has found to constitute a particular social group. Again, and I argued this case approximately two years ago before the court. The court was constrained to send it back under the precedence of Thomas v. Gonzales. But it felt strongly enough about the issue following the briefing and the oral argument that it put that in its brief, that this certainly sounds like it meets the characteristics. It's shared characteristics among a group that is of such fundamental importance to the conscience and identity of the individual that he should not be forced to change it. I would add that as well, Judge Hardiman, in the other decision that recently came out in the Ninth Circuit, the Daskoski decision, I believe, indicted Judge Kleinfeld got it wrong to be completely blunt and fair about it because he said, this does not constitute, it was a group of persons who were resisting gang membership. And the judge said, this does not constitute, this person does not constitute or his proposed group does not constitute a particular social group because he is free to change his circumstance and therefore he wouldn't be persecuted. He said the same thing about the taxi drivers, I guess it was Guatemala who imposed guerrilla groups.  But Judge McKee has hit the nail on the head. That's exactly it. The courts around the country have declined to recognize particular social groups precisely because someone could change their own circumstance. You no longer have to be a taxi cab driver. And in some cases… You can become a guerrilla. That's what the court said. You can become a guerrilla. You can cede to the group's demands. And that's where Judge Kleinfeld got it wrong in Daskoski because the whole principle behind ACOSTA, as recognized by Fatin, is we will recognize those that have shared characteristics, not just inequalities such as race and kinship or shared experiences, but those characteristics of an individual that are so fundamental to their identity and their conscience that we shouldn't require them to change it. What they got wrong in the Ninth Circuit in Daskoski in not recognizing that group as a particular social group was they said, you can change. You can just become a guerrilla. Mr. Galvanez, your destiny is in your own hands. You can join up and you can do what the gang does down there. That's precisely what ACOSTA was guarding against. That's precisely the protection that ACOSTA and this court in Fatin promised to these individuals. And that's precisely what the BIA is attempting to take away. Mr. Duffy, thank you very much. Thank you for your service and time. Thank you, Your Honors. Ms. Riccobal? Good morning. My name is Jessica Riccobal and I represent Petitioner Jose Mejuante. Much like the Galvanez case, the primary issue in this case is whether young men from El Salvador, lacking family ties and morally opposed to gang membership, may constitute a particular social group. Based on the evidence that Mr. Mejuante presented before the immigration judge, he presented sufficient evidence to establish membership in a particular social group under the framework that this court approved of in Fatin. Unlike your colleague, Mr. Galvanez, you've got an adverse credibility ruling to contend with. How should we look at that? And why was the IJ and the BIA, or were the IJ and the BIA wrong in terms of finding your client wasn't credible? Well, first, the BIA did not take a position on credibility. And under this court's precedent... You're right. So that question goes away because we have to assume the credibility. It was the IJ who deemed him not credible. The BIA didn't rule on that. You're right. Correct, Your Honor. Mr. Mejuante's case, based on his testimony and affidavit, as well as the corroborating affidavit of former MS member, Alex Sanchez, provide the best conceivable evidence of why he is a member of a particular social group. And it's this evidence that is what distinguishes this case from other similar asylum cases where applicants have failed to show membership in a particular social group. Mr. Mejuante specifically testified that MS targeted him for recruitment based on his membership in a particular social group and ultimately persecuted him for his refusal to join their ranks. Specifically, he testified that MS approached him two days after the death of his great grandfather and told him that he should not be alone in the world and that they could offer him protection. He declined membership, but they again approached him only a month later and said, I do not want to be a part of criminal activity. However, MS gave him one more chance saying that if you don't change your mind, you're going to experience problems. He understood that problems meant that he would be physically harmed. MS in El Salvador was recognizable by people in the community because MS had open public associations. Mr. Mejuante testified that he recognized MS members because they hung out by the soccer fields where he played, but also that there's ample evidence in the record that MS had certain markings, gang and tattoos, that made them recognizable in El Salvador. Tell me how you define your social group. Thank you. We do know the facts. How do you define your group? Mr. Mejuante's particular social group is young men from El Salvador lacking family ties and morally opposed to joining gangs. What family ties? He was, after the death of his great-grandfather, he lived alone. He didn't have any family near him. And MS recognized this particular aspect of his. I'm not asking about the facts of this case. I'm asking about how you define the group. What family ties? The death of a great-grandfather, the death of an adult male, what family ties are we talking about? Would the case be different if he was being raised by his great-grandfather and his great-grandmother? I think that here it's different based on what Mr. Alex Sanchez, the former MS gang member, said, and that is that MS specifically targeted people that didn't have any connection to the community with family. He did have a sister, though, didn't he? He did. But he didn't end up living with her. He didn't end up living with her. She was actually living in another part of the country, but he had no other family to speak of in El Salvador and certainly not in the area in which he lived. Is she still there? No, his sister has since moved to the United States. Okay, so that's after the record, I guess. According to the record, she was still there, at least at the time of the IJ hearing she was still there. Yes, Your Honor. Okay. So you define family ties as having no other immediate family in the vicinage? Yes. And how do the gang members or how does the Salvadoran society know that? Well, El Salvadoran society, based on the record, is quite small. Clearly, based on the record in this case, MS knew Petitioner from the time that he was young, a teenager, and they were pervasive throughout society. He specifically knew one of the MS gang members by name and is clear, based on his testimony, that MS knew that he didn't have family ties because the very first time they approached him was only two days after the death of his great-grandfather, and they told him, I know you're alone. You shouldn't be alone. Join us. His mother's in the U.S.? That's correct. Since he was young, right? Yes. So she moves back to El Salvador. He no longer is a person without family ties. The fact that she possibly could move back to El Salvador doesn't matter because once MS has identified Mr. Major Fuentes as someone that opposes them, he's on their list. He's made himself a target. All right. Well, that makes sense to me, but then that takes away your notion that it's dependent upon lack of family ties. I've asked you to just hypothesize that mother moves back, so he no longer satisfies the lack of family ties criterion. So are you in essence arguing that his rebuffing of their forcible recruitment efforts and their beatings that they inflicted upon him, that's what makes him part of a social group? That is certainly what makes him part of a social group, but his lack of family ties in the first instance is what caught MS's attention for recruitment. And that first instance of having no family ties when they tried to recruit him made him a particularly attractive target for recruitment. And once he was on their radar for recruitment. He was vulnerable. Yes. But the problem, though, is that's immutable. The family ties aspect is mutable. The fact that he rebuffed their efforts is not mutable. That's happened and no one can change that. But the family ties issue strikes me as a mutable characteristic. You don't know if he's going to remain alone in the world or whether he's going to have cousins or uncles or mom comes back. We don't know that, right? Well, I think what's important for the analysis is what his situation was at the time that MS first targeted him. And at that time he had no family ties. And because they were recruiting him and he rebuffed their efforts, he is forever going to be a target to MS because, in a sense, he was showing them no respect. The second part of the equation, either immutable or one should not be required to change, does that help you? Should he be required to say, hey, mom, you've got to come back and live with me in Guatemala? Is that something that the government should expect, that his mother should also be moved back along with him? Absolutely not, Your Honor. He shouldn't be required to try to obtain family ties. And there's no evidence in the record that he could, that his mom would, for example, move back to El Salvador. And Mr. Alex Sanchez's affidavit, from his experience as a former MS member, he knew how MS operated and he knew that MS specifically targeted individuals that were vulnerable, particularly those that didn't have family, and that once they were a target of MS, they couldn't escape the attention of MS. And if they refused to join MS, they would take that as a sign of lack of respect and they would persecute him for their ideological beliefs that criminal activity is wrong. What about the same thing I asked your colleague about the aging out of the cohort? How old is your client now? He's 29? Yes, Your Honor. He came to the United States when he was 24. So if he were to go back to be about 30, does he get to the point chronologically where he's no longer in the cohort that he's being persecuted by? No, I think that's similar to the family type aspect, that it matters what age he was. If his age is going to change, his family situation may not change. We know his age will change if he stays alive. All barges are going to change. Well, MS, the group membership, ranges in age from young boys to 40-year-olds. What does the record say about who they target for recruitment? The record says that they target young men specifically for recruitment as an initial matter. And it's this initial recruitment that makes him part of a particular social group because once he's caught their attention, he can't escape no matter what he does, no matter if he gets older or not. And I think that also based on the facts of this case, it's important to note that his brutal assaults from MS occurred over a period of two years. They didn't lose focus. They didn't forget about him. How many separate instances of assault were there, and what happened exactly? There were two separate instances of assault, Your Honor. The first was after a couple of encounters with MS where he said that he would not join the ranks, and they told him that they'd give him another chance, but he'd have problems. During the first instance of assault, he was going to a local store, and MS members recognized him and said, We've given you enough time, and you didn't join us. We're tired of you playing games. They started pushing him, hitting him, and started beating him with a baseball bat after he decided to try and defend himself. He was beat so severely that he sustained a broken clavicle, and the only thing that scared off MS members was when a nearby neighbor fired two shots into the air. He went to the hospital after that incident. He made a police report. However, the police said that there wasn't enough evidence to prosecute. What's the second instance of persecution? Yes, the second instance was also a persecution. They pulled him off of a bus as he was coming home from the beach. They just started beating him so severely that he lost consciousness. He wound up in the hospital for two weeks and spent six weeks at home before he could return to work, and MS also told him in a letter while he was at the hospital that you escaped this time, but if you tell anyone about it, you won't live to tell about it. And based on these facts, I think that Mr. Major Fuentes has proven that he has certain characteristics, such as sex and age, that made him a particular target of MS in the first instance. And secondly, his moral opposition to gangs is something that the court should not require him to change. The BIA erred when it relied on NRA AME to decide this case. But before you get there, I'm trying to understand how you connect the violence with his political opinions. How do we know that he's beaten because of his beliefs? Because he specifically told MS that he didn't want to be a part of their criminal activity, and they said that he would have problems if he refused to join. Based on that exchange, they knew that he was opposed to joining them on his ideological beliefs, and based on what they told him, that they would persecute him if he continued to hold those beliefs. But they're a violent gang, and violent people react strongly to others who don't take their suggestions. So how do we know that it's not simply as a result of their inherent violence as opposed to as a result of his beliefs? Well, I think, and I believe your Honor, you might be picking up on the government's argument that... It's just a legitimate question. We'll talk to the government in a few minutes. I think that any time that the violence rises to such a level where paralysis might result, such as Mr. Puente's friend Carlos, or murder, that it stops being about recruitment. It's about persecution, certainly for that individual. And it's about persecution based on their ideological beliefs that they won't join the gang, because they're morally opposed to criminal activity. You're right. It's concerning me, and I'm sure it's concerning the government. The parameters of the group. The group is defined so broadly, so amorphously, and so open-endedly, that almost anyone could imagine a circumstance in good faith where they could fit the definition of that group. I mean, is that a workable approach to either ACOSTA or the asylum statute in general? And my guess is that's why the board tried to engraft two additional criteria on it. And we can talk about that later on with Mr. Hurte. But what happens when the group morphs into something which is almost without containment? Yeah, and I don't think that this particular social group is one that's not sufficiently contained. There's no suggestion that MS targets other segments of society for recruitment in the first instance. It's primarily young men, particularly those that are most vulnerable in society, like Mr. Major Puente. The persecution center on something which is significantly important to the quality of life in a society that we should be cognizant of. For example, let's say somebody didn't want to sell drugs, and this is something that goes on in big cities in this country every day. Somebody gets up in the morning, they go to school, and they're targeted and beaten by the local drug dealers because they won't stand on the corner and sell drugs for them. If you transport that to another country and you have somebody saying, look, I was being asked to sell drugs. I was told if I didn't sell drugs, they're going to beat me. I did not want to sell drugs. I'm morally opposed to drugs. Therefore, I'm part of a particular social group. And we can go on from there. Is that a workable definition? Is that a workable approach to what asylum is? I think that we have to stay within the confines of the facts. And assume the government is unable to control the activity. Assume the governmental nexus is there. I think that within the confines of this case... We're going to write an opinion, and we may well write an opinion. And when it's out there, it's law. And whatever we say, clever lawyers and sometimes not so clever lawyers are going to try to take what we say and show us why it applies to their situation. We heard before an application of homosexuality in Cuba being applied to your case. Now, my guess is when Mr. Duff was making your argument, you weren't saying, hey, Martin, that doesn't apply to your guy. He's not a homosexual living in Cuba. He's not a female who opposes female genital mutilation. Why are you bringing the cases up to the court? Whatever we say is going to have precedence and significance beyond the narrow confines of this case. I'm trying to figure out how do we get a handle on that? I heard the board get a handle on that. If a particular social group becomes so amorphous and open-ended, where do we go with that? Well, the BIA, it's important to observe in this case, didn't say anything about problems with the particularity of Mr. Major Fuentes' social group. It only made a reference to social visibility. And certainly, since the only case it cited was INRE-AME, which had... Do you understand the difference? I don't think Mr. Duffy does. I don't. Well, ask Mr. Hurt. I'm not sure I understand the difference between social visibility and particularity. And frankly, they both sound like a lot of gobbledygook to me. I can't make a lot of sense out of it. Well, certainly from the BIA's opinion in this case, it's not clear at all what they meant by social visibility. But Mr. Major Fuentes has defined his particular social group in a very limited way. And it's based on the record, he was recruited by MS because he had certain characteristics that he could not change, his age and his sex, and ultimately persecuted because he refused MS's efforts of recruitment. And these are very discrete characteristics. It wasn't as if MS simply was brutalizing him because he was there. They were brutalizing him because they wanted him to join them, and he did not join them. And they specifically targeted him because of his age and because of his sex and because of his lack of family ties, because he was vulnerable. These are particular characteristics about Mr. Major Fuentes that make him different than the rest of society. But also, there are other members of El Salvador that fit within these characteristics, and so he is a member of a group. Particularly when the BIA cited to INRAE-AME, it's not clear at all in this case why they were quoting social visibility from the opinion. But INRAE-AME started with an essential premise in its reasoning that a group must have distinguishing characteristics, and it found that upper-class Guatemalans were not sufficiently different from the rest of Guatemalan society because they were at much at risk for extortion by a criminal element than other people in Guatemala with more modest means. Conversely, here, Mr. Major Fuentes was targeted by MS because he was young, because he lacked family ties, because he was a man. And these characteristics made him different than much of El Salvadorian society, and they are discreet enough for it not to encompass the rest of society. We do understand, we have to go over a little bit. Did you reserve time for... I'm not sure if you did, I don't think you did. Your Honor, Mr. Duffy collectively reserved time for both of us. Okay, thank you. Let me hear from Mr. Hurt. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Ted Hurt, appearing on behalf of the respondent,  Point it down just a bit. Yes, thank you. Point it right at your forehead. Sorry. A weird visual from up here. All right, is this better? That's great, thank you. Okay. Thank you, Your Honor. I'd like to allocate my time, obviously subject to the Court's questions, to the principal issues raised by Petitioner Galdamez, which is this challenge to the agency's formulation, including the social visibility and particularity requirements. I also hope to spend a little bit of time dealing with the specifics as to both cases. Two issues that I... As you may observe, we're not really quick to cut people off at the light. My guess is you'll have enough time to communicate to us what you want to. Maybe at least from my perspective, could you help me make sense out of the difference between social visibility and particularity? That is something, the difference in those two is this difference, I cannot get my head around, and I also can't get my head around what that adds to ACOSTA. Other than, frankly, it looks like an ex post facto attempt to harmonize all of the law and try to take the outliers and come up with a formula that you can fit them into. And so I come up with these two artificial constructs and graft them onto ACOSTA. Your Honor, I'd like to take those questions in reverse order, if that's okay. I'm guessing it might help at least my chain of the analysis. In 1985, when the Board decided matter of ACOSTA, as Judge McHugh noted, it was dealing with a group that did exist. It was dealing with an El Salvadoran taxi cooperative. So the irony of that case is there was a group, and no one questioned that there was a group. The question was what are the innate characteristics that might give recognition to the members of that group had been persecuted by the guerrillas. So when we look at the Board's effort to both go at immutable characteristics or in the case of people who banded together to be a cooperative, it looked at the issue of experience and it looked at the very difficult question, perhaps, of experiences that one might not be required to change. What we've said in our brief is that as the Board developed more decisions, it actually started looking at what we call the social perception, social visibility notion. We cited matter of RA, which, although vacated for other reasons, in 1999 discussed the external perception issue. I know. I read your brief and I understand your view, right? What I'm trying to understand is why you did what you did, right? So I guess the first question that I have is, from your perspective, what was missing from the ACOSTA formulation? What is the ill that you were attempting to address? Well, I don't know that there was anything missing from the ACOSTA formulation, but as the Board adjudicated... The RA would fit into ACOSTA, wouldn't it? Well, the facts of RA, of course, went off in a different direction in terms of issues of spousal abuse. So the facts of RA, I'm trying to separate out, if I could, from the analysis in RA. Maybe the case I would go to is matter of age, which dealt with a sub-clan in Africa. And if you look at the facts of that case... Why wouldn't that work under ACOSTA? Because in that case, a lot of the Board's discussion is directed at verifying that there was a stand-alone clan, an African tribal unit, that was being persecuted. So they were looking... Actually, when you read the decision, there wasn't a lot of discussion of the characteristics, but a lot of discussion of the societal evidence that the clans in this part of Somalia were very discreet, and the petitioner was part of a clan that was 1% of the population, and they had linguistic and other commonalities that were distinctive. Again, but that's ACOSTA. Persecution on account of membership of a particular social group refers to persecution that is directed toward an individual who is a member of a group of persons, all of whom share a common... Now we've got a sub-clan. You can't get much more of a group than that. All of whom share a common immutable characteristic, and then beyond the power of the members to change or one which they are not to be expected to change. A sub-clan gives you that, doesn't it? Well, it gives you that, but I think the point I'm trying to make is that what the Board is doing on a case-by-case basis is it's looking at each putative proposed group that comes to it, and it analyzes, is there a group? And in these cases, they've been able... It's saying you look at, is there a group? Which is kind of like saying, I'm going to build a car and I'm going to start with a car. How can you determine if there is a group without having a definition of a group to begin with? It's almost like the old saying, where you come out of something is where you're going to look. If you're looking at something, you determine, is there a group? In the process, you change the calculus of the group. I'm not quite sure where that gets you. It looks to me like what happened is exactly what I mentioned earlier in my question, that you've got this body of law which is kind of all over the place, and this is a concept which, as I suggested to Ms. Rickbau, does have the potential for being incredibly amorphous, open-ended, so that anybody can come up with enough commonality in a particular society to put themselves in it, which is a very legitimate concern on your part. So you come up with a way of defining group which lets you at least think like you're getting a handle on it, but you're not really adding anything to the initial calculus. You're not really limiting the problem. Acosta works very well for determining the sub-clan of the Cucuyu in that case. And if you add female genital mutilation on it, Acosta works very, very well for that. Homosexuals in Cuba, Acosta works well for that. Where Acosta does not work is cab drivers in El Salvador. Some of the people in Colombia were being shaken down by FARC. In those cases, Acosta really does not work because you don't have an immutable characteristic there. The standing of the Honduran street children, as Judge Weiss said in his opinion, those things can change. Well, I think one of the issues is really what I'll call indeterminacy, which is that as the board has confronted in its precedential decisions these more recent proposed groups, what each of these petitioners have in common is that they're coming in and saying, I have certain characteristics that are fundamental to me. Other people in my society have these characteristics. We are being persecuted. Therefore, we are a group. Now, I'm oversimplifying a little bit, but the board's concern, and that's why it is refining, if you will, or evolving in terms of looking at these cases, is that there has to be a group before the persecution exists. I don't think anyone has ever challenged and the UN High Commissioner's guidelines acknowledge this. A group has to preexist and predate the persecution. It is not going to be formed by the persecution. Otherwise, you have the circularity problem. So what the board is trying to do in the gang cases, for example, is ask, is this a group that would be recognizable in society? But can't they be recognizable after the persecution? I mean, in Gomez Zuluaga, the Colombian woman who was kidnapped and threatened by the drug cartel, she wasn't part of a social group until after she refused to return to her captors. I mean, they released her under the promise that she would return to them after she finished her dental program and care for apparently the dental needs of the FARC. Well, Your Honor, so, you know, she obtained the status of being a member of a social group by virtue of the fact that she did not comply with the FARC's requirement that she return to them. And she knew, she persuaded our panel that the FARC would not take kindly to the fact that she, after being released under condition that she return to take care of their dental needs, that she denied them that opportunity. So how do you square the argument you just made with our decision in Gomez Zuluaga? Well, you know, with the caveat that I don't know how that decision would be decided by the board today in 2010, I can say that what distinguishes Gomez Zuluaga and Luquago, I think, in the same reason, is that while the court in each instance did not recognize a very diffuse or broad social group of children who might be conscripted or of women or others who might be conscripted by the FARC guerrillas, there was a narrower, very different group. Well, that's what I'm getting at, is I'm not sure the group is the hard part here. It's the particular group. And there just seems to be something anomalous about the analysis here, because the particularity requirement seems to suggest that if you're part of a small group of people like the woman in Gomez Zuluaga, tens of people, perhaps hundreds at the most, you win. But if this is happening to millions of young men in Central America who the MS is coming after, you don't win because you're not particular. You're too, to use Judge McKee's words, amorphous, indefinite. You're just such a big mass of people that the board is going to say, perhaps for practical reasons, that, well, we just can't give this group particular group status because then we're inviting 12 million young men from Central America to get status in the country. Is that really what's going on here? No, Your Honor. I think that, and I know that this may seem that I'm deriving too much out of Acosta. But even in Acosta, the principle, the statutory construction principle, the Latin, was trying to look at the words membership in a particular social group in the same way as the other limited grounds for protection, political opinion, nationality, religion, and trying to reconcile them and not make membership in a particular social group a catch-all or a safety net where the people are not really part of a bona fide group. So particular assists us in that because particular helps to define the boundaries of the group, and that's what's said in AME. The board didn't come up, I would say the board hasn't come to this as a revelation independent of other people. The UN guidelines talk about perception. No, but the guidelines, the commissioner says, the high commissioner says you've got it absolutely wrong. Well, if we have it absolutely wrong, then why does the European Union directive that we quoted in our brief adopt the same formulation as the board? In the alternative, in the disjunctive or in the conjunctive? In the conjunctive, in the conjunctive. And I've not heard any reply on that. Do you agree with Mr. Duffy that our decision is essentially what we do with SEG? SEG either is entitled to Chevron deference and your position carries the day, or SEG is not entitled to deference and Mr. Duffy and Ms. Rickabaw's position carries the day. Is that painting it correctly? It's roughly correct, although I would certainly say that if this court had a concern with the board, we would ask for a remand for the board to reconcile these trains of legal thought and not for the court to reach this issue in the first instance. But you're right, Judge Hardiman, this goes to Chevron deference, and it seems to me that, and I would like to discuss Judge Posner and Gettyme if I have the privilege. I wish you would, because I read that and I almost got a stiff neck from nodding so much. Well, and if I can just add before you get into that, the BIA's order in the Mejia-Fuentes case somehow elided social visibility into particular social group. It doesn't say that Mejia-Fuentes is not part of a particular social group. That order says he lacks sufficient social visibility and therefore he fails. And I didn't, you know, I could be more confused now than ever, but I thought there were distinct characteristics and that the petitioner needed to prove both. But maybe I'm wrong on that. Well, Your Honor, I guess I would say with regard to Petitioner Mejia-Fuentes, one of the points we raised in our brief, and I'm not taking time on it today, is we challenge whether they've even waived the argument. But coming to your point, Judge Hardiman, I think that social visibility is the key point for Mejia-Fuentes because the evidence that Ms. Ricabal has cited is a statement by Mr. Sanchez that people like Mejia-Fuentes are, quote, particularly vulnerable to gang recruitment, and that Mr. Mejia-Fuentes himself said that he opposed the gangs. Well, we go back to the board applying SEG and EAG in terms of the same type of analysis. Where is the extrinsic evidence that the Society of El Salvador or the Society of Honduras use young men of this demographic as a distinct particular social group? But Judge Posner picked that apart in Getimi, didn't he? Maybe it's a good time to address Getimi. He took off on that launch. Well, I think one point to make is that Judge Posner does not disagree with the gang decisions such as Ramos-Barrios, and Judge Posner also in his decisions has acknowledged that groups have to be definite and well-defined, and in fact he pointed out that using a term like middle class would be too indefinite. But that gets to the particularity requirement, not the social visibility requirement. Well, Judge Hardiman, in terms of social visibility, Judge Posner said, well, I don't understand what work it does, and I think that these cases would be decided the same way without it. Now, Judge Posner did not, I think, have the benefit of full analysis of social visibility, but social visibility goes to the external perception, and in fact Judge Posner didn't disagree with that. Homosexuals in Cuba or women who oppose female genital mutilation, how do you get social visibility out of that? Well, I think that the misapprehension that Judge Posner had when he used those as examples was the statement that the individual had to be literally visible to a stranger or passerby on the street. The board's decisions have been very careful and very precise, and I hope I've quoted them correctly in my brief, that the attribute, the shared characteristic, is the recognizable characteristic, not you or I. I have the same question. What is the shared characteristic in those cases? The shared characteristic is mental attitude or sexual preference. How does that manifest itself to the person on the street? Well, I don't know that it necessarily will manifest itself to the person on the street. The point in terms of groups is does the society cognitively understand that these groups exist? Now, in Tobasso it was very easy because homosexuals had to register, but I would submit that in other cases one has to look at a societal understanding as to whether a group exists or whether the characteristic exists. One does not have to look at individuals, and the board has not said that an individual-level characteristic has to be there. It links in, actually, to another point that I think you made in terms of prior questioning, which is why do we look at the society and its perception and not that of the persecutor? It's because the persecutor, one-on-one, can have many motives to go after me, vengeance, vendetta, random violence, and that really is the story of these El Salvadoran gangs. What we have to look at is am I being targeted because I'm a preexisting member of a preexisting group? So societal perception helps us understand that. But I'm not sure that's how because in terms of overall society, society may not really care how a given individual thinks about female genital mutilation, gender preference, if the individual persecutor, the person who's manifesting the harm, why wouldn't it be the definitional lens of that person's focus that determines the group? Well, I think the two reasons for that are, first of all, because what we're... I hate to interrupt you, but before I lose, you can keep your train of thought better than I can keep mine. And I think I'm losing it as it is. It may well be that a group will be persecuted for certain reasons, the reasons that the overall society really doesn't care that much about, may not even be aware of, but there is another group of people in a given society who will set upon certain of their citizenry and persecute them because of, and I'll call that group the persecutors, because of the mindset of the persecutors or persecutorial group. You're saying unless the overall society is cognizant of that or is willing to acknowledge it, there's no group, even though people who belong to this group are going to be persecuted if they happen to encounter one of the persecutors in the street. I'm not sure that makes any sense. I think the point is, and the board in each of these decisions has looked at State Department, other evidence in terms of what is the underlying...